IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ROY MITCHELL,

                Plaintiff,

v.

KEVIN KALLAS, et al.

                Defendants.

OPINION & ORDER

15-cv-108-wmc

---

On April 7, 2015, this court granted plaintiff Roy Mitchell leave to proceed under 42 U.S.C. § 1983 on Eighth Amendment claims against Drs. Kevin Kallas and Dawn Laurent for their alleged failure to treat Mitchell for gender dysphoria while she was incarcerated at Columbia Correctional Institution ("CCI"). (Dkt. #11.) Before the court are plaintiff's Motion for Partial Summary Judgment (dkt. #86) and defendants' Motion for Summary Judgment (dkt. #110). Since the undisputed facts do not support a finding that Kallas and Laurent acted with deliberate indifference to Mitchell's need for treatment, plaintiff's motion will be denied and defendants' motion will be granted. Moreover, even if a reasonable jury *could* find deliberate indifference on this record, both defendants are entitled to qualified immunity given the unsettled law and varying protocols for gender dysphoria. Accordingly, judgment will be entered in defendants' favor.

UNDISPUTED FACTS[1]

I. Parties

Roy Mitchell is a former CCI inmate. While biologically male, Mitchell identifies as a

---

[1] Unless otherwise noted, the following facts are material and undisputed. The facts are drawn from the parties' proposed findings of fact, as well as underlying evidentiary support submitted by both sides.

female.

Defendants Drs. Kevin Kallas and Dawn Laurent are both employed by the Wisconsin Department of Corrections ("DOC").  Dr. Kallas is a trained psychiatrist.  He has been DOC's Mental Health Director since 2002, overseeing the DOC's mental health care.  His responsibilities include supervising the DOC's Psychology Director and Psychiatry Director, assisting in developing mental health policies, and conducting clinical consults on specific cases by request.  As such, Kallas does not provide direct clinical treatment to inmates at institutions, and he has never provided direct clinical treatment to Mitchell.  Rather, he was involved with assessing and ushering through her requests for hormone treatment.

Dr. Laurent is a licensed psychologist.  She was employed as the Psychological Services Unit ("PSU") Supervisor at CCI from December 2011 to November 2013.  During this time, Laurent was responsible for development, administration and coordination of psychological programs in the unit.  In that capacity, Laurent met with Mitchell once, during October of 2012.

## II. DOC's Gender Dysphoria Treatment Generally

Gender dysphoria is defined by the DOC as:

Discomfort or distress caused by a marked difference between an individual's expressed/experienced gender and that gender that others would assign him or her.  A DSM-5 diagnosis of gender dysphoria requires the condition to be present for at least six months and causes clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Within the DOC, psychologists and psychiatrists together diagnose, monitor and treat inmates with gender dysphoria.  However, only psychiatrists have the authority to order or administer

hormone treatments.

During his time as Mental Health Coordinator, Dr. Kallas has been involved with approximately 100 inmates with gender dysphoria. Kallas believes that there are approximately 35 inmates in the DOC with gender dysphoria currently. Kallas also sits on the Gender Dysphoria Committee (the "Committee"), which was created in 2011 to ensure that inmates meeting the DSM criteria for gender dysphoria receive appropriate treatment. Among other endeavors, the Committee consults with outside authorities regarding inmates with gender identity issues.

One such outside authority is Cynthia Osborne, who holds a Masters of Science in Education and a Masters of Social Work. She is an assistant professor at Johns Hopkins University, and she specializes in providing gender dysphoria evaluations. As a part of her consults, Osborne travels to Wisconsin each year, evaluates selected inmates in person and makes recommendations regarding gender identity diagnoses. Osborne also conducts a monthly conference call for PSU staff at DOC institutions across Wisconsin to discuss questions related to inmates with gender dysphoria issues.

DOC has also implemented a gender dysphoria policy, DAI #500.70.27. In outlining DOC's treatment of gender dysphoria, the policy takes into consideration various guidance documents, including the World Professional Association for Transgender Health ("WPATH") standards of care. WPATH standards of care provide clinical guidance for the treatment of transgender patients, but they are "flexible" and can be modified to address the needs of the institutional environment.

Particularly relevant to the present lawsuit, DAI #500.70.27 permits hormone

3

treatment for inmates with gender dysphoria as a means to feminize the body, reduce gender dysphoria and minimize the risk of depression, anxiety or other impairments. The policy provides that inmates who are not receiving hormonal medication at the time of DOC intake may be started on hormonal medications provided that: (1) the inmate cooperates with DOC staff in obtaining records or other necessary confirmations of previous treatment; and (2) the Committee determines that the hormones are medically necessary and not contraindicated for any reason. As noted above, the Committee can use an outside consultant to make treatment decisions, a practice that is consistent with the WPATH standards of care. The DOC is not, however, bound by any recommendations made by consultants.

Finally, DOC has a practice *not* to begin hormone treatment unless an inmate will remain incarcerated for at least six months after treatment begins. DOC justifies this practice on three grounds: (1) the DOC needs six months to assess the benefits of the treatment and any side effects, as well as to determine a proper dose and follow appropriate follow-up laboratory tests to check for signs of cardiovascular impairment and venous thromboembolism; (2) hormone therapy cannot actually begin until the inmate has been screened for medical contraindications; and (3) WPATH standards emphasize the importance of medical screening before administering hormone therapy, as well as consistent clinical and laboratory monitoring during the first year of treatment. While the DOC does not provide treatment after an inmate's release, the Committee has on occasion responded to questions from the Division of Community Corrections agents about conditions of supervision for former inmates with gender dysphoria.

4

### III.   Mitchell's Hormone Treatment Requests

Before arriving at CCI on October 11, 2011, Mitchell had already been diagnosed with gender dysphoria.  Upon her arrival, Dr. Patrick Kumke, a Psychological Associate, met with Mitchell and noted several diagnoses, including gender dysphoria.  Kumke also noted that PSU would continue routine clinical monitoring of Mitchell.  He further instructed Mitchell to talk to her assigned clinician once she received her housing assignment.

On November 25 and 27, 2011, Mitchell submitted formal psychological services requests asking for female hormone treatment.  Dr. Teresa McLaren from PSU responded that they could discuss these requests during their appointment, which was scheduled for that week.  When the two met on November 30, they discussed Mitchell's ongoing nightmares, sleep problems and social habits.  Mitchell also asked about the DOC's policy related to gender dysphoria.  In response, McLaren advised that the policy was in the process of being finalized, and she would provide a copy to Mitchell once it was complete.

In December of 2011, Mitchell wrote a follow up request to Dr. Kallas for hormone treatment.  In response, Dr. Kallas asked Dr. McLaren to conduct a gender dysphoria assessment on Mitchell.  After conducting an exam, Dr. McLaren responded that in her opinion Mitchell should be considered for gender dysphoria treatment by the Committee.  The Committee likewise deemed Mitchell an appropriate referral for an evaluation by its consultant from Johns Hopkins, Cynthia Osborne.

On March 5, 2012, Dr. Kallas wrote to Mitchell, advising that she would be meeting with Osborne for a consultation in April of 2012. (*See* dkt. #1, Exh. E.)   Kallas also told Mitchell to work with Dr. Laurent in assigning her a clinician.   At the beginning of April,

5

Mitchell submitted yet another psychological services request, which she directed to Dr. Laurent's attention at Dr. Kallas's direction, to find out when Osborne would be seeing her.

On April 6, Dr. Caldwell-Barr met with Mitchell, having become her assigned clinician. (*See* dkt. #97-1, at 18.)  Dr. Laurent signed Dr. Caldwell-Barr's April 6 note about her meeting with Mitchell, but she never personally responded to that request.[2]   Dr. Laurent was not involved in Osborne's later assessment, evaluation or recommendation, and she had no input into whether Mitchell would receive hormone treatment.

On May 22, 2012, Osborne saw Mitchell in person at CCI.  During their meeting, Osborne interviewed Mitchell for several hours, and Mitchell provided names of many family members and individuals in the community that would have knowledge related to her gender dysphoria issues.  After the interview, Osborne reviewed clinical and institutional records and spoke to family and community members about Mitchell, but she had trouble locating some of the individuals Mitchell mentioned during the interview.

Because Mitchell had been inquiring about the status of Osborne's assessment, Dr. Kallas wrote to Mitchell at the beginning of October to explain that the report had been delayed because Osbourne was having problems contacting two of the individuals with whom Mitchell suggested she should speak.  Kallas also told Mitchell that Osborne was still in the process of completing her report and that once the report was ready, PSU would receive a copy and proceed with her formal review.

---

[2]   According to the records Mitchell submitted, Dr. Laurent also signed notes from Mitchell's appointments with other PSU staff on May 22, 2012, and December 19, 2012, in her capacity as a PSU supervisor  (dkt. #97-1, at 23, 31).  Although these appointments included the fact that Mitchell was having issues with gender dysphoria in the prison, the notes did not involve discussions of her requests for hormone treatment.

On October 11, 2012, Mitchell was seen by Dr. Laurent, who was filling in for Mitchell's primary clinician. However, Mitchell did not bring up any gender dysphoria concerns during this appointment.[3] On October 30, 2012, Osborne did conduct a second interview with Mitchell by telephone.

On November 15, 2012, DOC received Osborne's draft report, dated September 27, 2012. On December 2, 2012, DOC received Osborne's final report. According to Dr. Kallas, it is not unusual for the initial assessment, evaluation and recommendation process for hormone treatment to take several months. In this case, the recommendation took longer due to the difficulties Osborne experienced in contacting all individuals she needed to interview for her evaluation and recommendation. When the process began in 2012, Dr. Kallas believed that there would be sufficient time for Mitchell to begin hormone therapy, and that Osborne would ultimately recommend they proceed. He did not anticipate that Osborne's assessment would be so significantly delayed.

In the final report, Osborne made the following three recommendations: (1) Mitchell is an excellent candidate for hormone therapy, and that there is a high likelihood that it would improve her functional stability and psychological well-being; (2) the physician that Mitchell consults with regarding hormone therapy should consider whether chromosome analysis should be conducted to rule out Klinefelter Syndrome; and (3) Mitchell should participate in

---

[3] Mitchell contends that she again requested hormone therapy during Dr. Laurent's October 11 exam, but the *only* evidence she cites in support is Laurent's response to Mitchell's Request for Admissions. (*See* Def. Resp. to Pl. Request for Admissions, dkt. 88-1, at 27.) In her response, however, Dr. Laurent did *not* admit that Mitchell asked for hormone therapy when they met; she admitted only that she met with Mitchell on one occasion. Even if the court were to assume that Mitchell would testify to such a request of Dr. Laurent on October 11, it would not be a material dispute since any recommendation on hormone therapy was in Osborne's hands at that time, as the designated expert.

supportive counseling concurrent with any hormone treatment, whether within the DOC or following release.

Osborne further noted that Mitchell was not familiar with the WPATH standards of care. Therefore, she recommended that if hormone therapy was approved, it would be important to obtain Mitchell's informed consent before proceeding, to ensure that she understands: the medications and their possible side effects, in particular their effects on her sexual drive and arouseability; the importance of compliance and cooperation with the prescribing physician; and the importance of working with a qualified prescribing physician, rather than seeking hormones that are less expensive, but potentially harmful.

On November 28, 2012, Mitchell reviewed a copy of Osborne's draft report with a PSU associate. Thereafter Mitchell wrote to Dr. Kallas and Dr. Ankarlo, the DOC Psychology Director, to request hormone treatment once again. Because Mitchell was scheduled to be released from DOC custody in early January 2013, however, her request to initiate treatment within the DOC at that time was denied. By letter to Mitchell dated January 2, 2013, Dr. Kallas instead: (1) referred Mitchell to Osborne's recommendation that she seek hormone treatment within the community; (2) told her that Osborne would be willing to continue working with her; and (3) recommended that Mitchell take a copy of Osborne's report so that she could seek hormone treatment when she was released.

Mitchell was released on January 8, 2013, but she did not use Osborne's report to obtain hormone treatment in her community.[4] Almost two years later, in November of 2014,

---

[4] Mitchell avers that she *did* attempt to seek hormone therapy and that her probation agents stopped her, but as explained in a previous order denying reinstatement of her probation agents as defendants in this matter, Mitchell had no other evidence of her agents barring her from seeking hormone therapy

8

Mitchell was reincarcerated at Dodge Correctional Institution. When she arrived, Dr. Dawn Landers, a psychologist, conducted a mental health screening. Due to Mitchell's gender dysphoria history, Dr. Landers recommended Mitchell's placement on a special management unit. Apparently after Mitchell requested hormone therapy, PSU staff at Dodge reached out to Dr. Kallas to determine whether DOC should commence with it. Because Mitchell was scheduled for release in three months, and because Dr. Kallas believed that Osborne's assessment was too outdated to be reliable, this request for hormone therapy was also denied.

OPINION

Mitchell claims that Drs. Kallas and Laurent were deliberately indifferent to her gender dysphoria in violation of her Eighth Amendment rights, and she is seeking monetary damages

---

while she was on probation. (*See* Order, dkt. #154, at 6-8.) More importantly, for purposes of this lawsuit, the undisputed evidence is that the named defendants here in no way impeded Mitchell from seeking treatment once released. On the contrary, the defendants and DOC encouraged her to do so. Nevertheless, Mitchell's summary judgment briefs still include arguments that her probation agents -- Joseph Ruhnke, Brittany Wolfe and Nicole Raisbeck -- violated her constitutional rights. In particular, Mitchell continues to assert that these individuals impeded her ability to seek hormone treatment and required her to dress like a man during the time that she was out of prison. Whatever the merit of Mitchell's possible claims against her former probation officers, those claims are not so closely related to the alleged misconduct by the defendants here to justify revisiting the court's repeated refusals to allow them to proceed in this lawsuit, most especially because the legal and medical obligations of physicians within DOC are simply too dissimilar to the obligations of the Wisconsin Probation Office. Indeed, the court has not been able to locate any authority suggesting that in these circumstances Mitchell's probation officers specifically, or the Division of Community Corrections generally, were required to ensure that Mitchell receive the same type of care provided by DOC upon her release. Regardless, the risks of prejudice and confusion in merging the two distinct set of obligations are manifest in plaintiff's continued efforts to blur them, as explained in the court's most recent order. (Dkt. #154, at 9-10.) For these reasons, as well as the reasons previously explained, the court will not address this issue further and will, again, deny Mitchell's recently filed motion for reconsideration (dkt. #157). Of course, these rulings are without prejudice to Mitchell pursuing claims against the probation officers in a separate lawsuit.

for her physical, emotional and mental suffering. Defendants argue that the undisputed facts establish their actions satisfied any obligation under the Eighth Amendment. Regardless, they claim entitlement to qualified immunity. After considering the parties' arguments, their proposed findings of fact, and the evidence in the record, as well as the current, unsettled state of the law with respect to Mitchell's entitlement to a more immediate hormonal treatment for gender dysphoria, the court is compelled to conclude that the named defendants did not act with deliberate indifference. For much the same reasons, those defendants are certainly entitled to qualified immunity on these facts.[5] Accordingly, the court will grant summary judgment in defendants' favor and deny plaintiff's motion for partial summary judgment. *See* Fed. R. Civ. P. 56(a).

I.  **Eighth Amendment**

The states have an affirmative duty to provide medical care to their inmates. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to the serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" and violates the Eighth Amendment's prohibition against cruel and unusual punishments. *Id.* at 104. To succeed on an Eighth Amendment medical care claim, a plaintiff must show (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). As defendants acknowledge, this circuit

---

[5] The court reaches this conclusion despite recognizing the need for a clearer articulation of the medical risks and benefits for both delaying or precipitously completing assessments of the advisability of hormone therapy for gender dysphoria, as well as clearer case law with respect to an inmate's right to prompt treatment. As explained in the court's previous order denying Mitchell's requests for assistance in recruiting counsel in this case, however, the court has been able to evaluate Mitchell's arguments and review all applicable law that would support her position, and it is apparent that the *current* law simply does not support her position. Nor would the assistance of an attorney in this matter alter that reality.

has already held that dysphoria is a serious medical need, *see Fields v. Smith*, 653 F.3d 550 (7th Cir. 2011). The primary issue, then, is whether defendants' response constituted deliberate indifference.

Deliberate indifference constitutes more than medical malpractice; the Eighth Amendment does not codify common law torts. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) ("[M]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.") In particular, an inmate's, or even another doctor's, disagreement with a medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997).

While deliberate indifference requires more than negligent acts, it also requires something less than purposeful acts. *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). The point between these two poles lies where "the official knows of and disregards an excessive risk to inmate health or safety" or where "the official [is] both aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he . . . draw[s] the inference." *Id*. at 837. A jury can "infer deliberate indifference on the basis of a physician's treatment decision [when] the decision [is] so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A prisoner may establish deliberate indifference by demonstrating that the treatment he received was 'blatantly inappropriate.'") (citing *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)). Here, the undisputed evidence precludes a reasonable jury from making that inference as to

11

either defendant Kallas's or Laurent's actions.

### A. Delay In Completing Evaluation

While the defendants would focus mainly on the whether Dr. Kallas's ultimate decision denying Mitchell hormone treatment was deliberately indifferent, that does a disservice to Mitchell's principal claim of indifference as evidenced by the fact that it took a year -- from December 2011 to December 2012 -- for defendants to reach that final decision. A claim of delayed care, even a delay of just a few days, may violate the Eighth Amendment if it caused the inmate's condition to worsen or unnecessarily prolonged his pain. *See McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[T]he length of delay that is tolerable depends on the seriousness of the condition and the ease of providing treatment.") (citations omitted); *Smith v. Knox County Jail*, 666 F.3d 1037, 1039-40 (7th Cir. 2012); *Gonzalez v. Feinerman*, 663 F.3d 311, 314 (7th Cir. 2011). Even so, the delays in treatment here do not constitute deliberate indifference, because the undisputed facts establish that the delays were either reasonable, or at the very least not attributable to either defendant.

#### 1. Dr. Kevin Kallas

When Dr. Kallas first received Mitchell's request for hormone treatment in December of 2011, he did not delay the evaluation process. Instead, he ordered a gender dysphoria assessment, which led to Dr. McLaren opining that the Committee should consider gender dysphoria treatment for Mitchell. In turn, the Committee agreed that its outside expert, Ms. Osborne, should evaluate Mitchell. While Dr. Kallas apparently took until March of 2012 -- approximately three months -- to inform Mitchell that Osborne would be performing the

consultation, that alone is not enough to permit a reasonable jury to find he acted with deliberate indifference, especially where the undisputed evidence shows that Kallas supported treatment throughout the process established for Mitchell's evaluation by a designated expert and took *no* steps to impede that evaluation.

Admittedly, Mitchell submitted follow-up requests and questions to her treating clinicians while awaiting Osborne's recommendation, but any delay was not attributable to deliberate indifference by Dr. Kallas. On the contrary, there was no point in time when that process had stopped and Dr. Kallas would not let it proceed. Rather, Dr. Kallas acted reasonably even during the ninety day period before he responded to Mitchell's initial inquiries, since he was following an established medical protocol that required Mitchell's then treating clinician, Dr. McLaren, to provide the Committee with a gender dysphoria assessment before the Committee would engage its expert, Osborne, to perform a more in-depth evaluation.

Any further delay had nothing to do with Dr. Kallas; it also appears reasonable, if lengthy. Osborne's formal assessment of Mitchell began on May 22 and took until December of 2012, in part because of the complexity of evaluations of this type, which require time to gather a detailed sexual history, review prior clinical and legal records, and determine the consistency of symptoms. There is also no factual dispute that Osborne's evaluation hit a snag because she could not locate certain individuals with relevant information whom Mitchell herself identified when speaking with Osborne. Moreover, during this delay, the record shows that Dr. Kallas kept in touch with Mitchell, responding to her October request for an update by letting her know that Osborne's evaluation was still in the process of being completed *and*

that she would be able to review the report once PSU received it. At the end of October, Osborne conducted her own follow up interview with Mitchell. At the end of November, Osborne then submitted her draft report, which Mitchell was allowed to review before renewing her request for hormone therapy.

After receiving Osborne's final report at the beginning of December, the Committee admittedly responded by denying Mitchell's request because by then she was within a few months of being release, but even then it was Dr. Kallas who suggested that Mitchell use Osborne's final report as a means of seeking hormone treatment in the community. Kallas also informed Mitchell that Osborne was willing to continue working with her after her release.

These undisputed facts not only establish that Osborne was attempting to get relevant information from May through October, but that her delay was at least explainable. Indeed, there is no dispute that Osborne needed to speak with all of the individuals that Mitchell had identified as having relevant information, especially given the complexity of her evaluation and the potential serious, negative side effects of proceeding with hormone therapy. Certainly, that process took longer than Mitchell had expected or demanded, but not so long as to violate the Eighth Amendment, at least under the current uncertain state of medical knowledge and the law.

Even more materially for purposes of this lawsuit, there is *no* evidence that the defendant, Dr. Kallas, knowingly disregarded Mitchell's gender dysphoria during this time in light of the seemingly credible reasons Osborne gave for her delay as the undisputed expert to whom the Committee generally, and Dr. Kallas in particular, were reasonably deferring. *See Arnold v. Wilson*, No. 1:13-cv-900, 2014 WL 7345755, at *6 (E.D. Va. Dec. 23, 2014) (no

14

deliberate indifference where inmate had to wait almost two years for hormone treatment to begin because prison had difficulties finding an endocrinologist, and inmate had to go through multiple rounds of tests, as well as follow-up between defendants and inmate's doctors). What is more, Osborne's delay was not caused by Dr. Kallas. Finally, far from acting with deliberate indifference, Kallas not only supported involving Osborne, DOC's contracted expert on the diagnosis and treatment of gender dysphoria, but kept in touch with Mitchell during Osborne's investigation, informed her that Osborne's report would be provided to her as soon as it was available, and followed up with Mitchell after her request was denied to provide alternative suggestions upon her impending release from prison.

On these undisputed facts, there is no evidence that Dr. Kallas could have sped up the process or done the evaluation himself, much less that he acted with deliberate indifference. Rather, the undisputed facts leave the court with the impression that if Mitchell's release from CCI were farther into the future, Osborne would have readily supported Mitchell receiving hormone therapy, beginning with testing for proper dosage and then, if appropriate, receiving the hormone treatment.

    2. Dr. Dawn Laurent

Regardless of the propriety of plaintiff's course of evaluation and ultimate denial of treatment under Dr. Kallas's supervision, defendants contend that Dr. Laurent was not sufficiently personally involved in Mitchell's gender dysphoria evaluation and treatment to be liable under § 1983. *See Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (defendants liable under § 1983 only if they were personally involved in depriving plaintiff of constitutional

15

rights). Certainly, Dr. Laurent was the PSU supervisor, and she signed multiple notes where Mitchell and her treating clinician discussed Mitchell's gender dysphoria. She also personally saw Mitchell for one appointment.

Although Dr. Laurent clearly knew about Mitchell's gender dysphoria, she was also never in a position to directly address Mitchell's requests for hormone treatment. More importantly, Dr. Laurent was not in the position to decide whether Mitchell *should* be evaluated for or receive hormone treatment, much less the authority to begin administering the treatment to her. Accordingly, even if the process by which Dr. Kallas and the Committee ended up denying Mitchell hormone treatment constituted deliberate indifference, Dr. Laurent was not sufficiently involved to warrant liability under § 1983. *See Smith v. Rohana*, No. 10-3402, 2011 WL 2880826, at *2 (7th Cir. 2011) (unpubl.) (dismissal of doctor proper where no evidence that he was involved in the care and treatment of the medical issue in dispute although he participated in other aspects of inmate's care).

> B.  Final Decision Denying Treatment

Turning finally to the Committee's ultimate decision denying Mitchell hormone treatment, there is again no evidence in the record that would support a finding that either Drs. Kallas and Laurent were deliberately indifferent. As for Dr. Laurent, she played *no* role in the final decision. While Mitchell repeatedly contends that Dr. Kallas deliberately ignored Osborne's recommendations, the facts establish the opposite.

As part of the Committee that denied Mitchell the hormone treatment, Kallas followed DOC's policy not to start hormone treatment for an inmate scheduled to be released within six

months of beginning treatment. This policy was not clearly wrong since the undisputed evidence in DOC's records establishes that commencing and maintaining hormone treatment requires at least several months of continuity of care for multiple reasons. Even if mistaken, Kallas's decision and that of the other experts on the Committee to follow the policy was at worst negligent, not deliberate indifference.

For one, before any patient can begin hormone treatment, the individual must be screened for medical contraindications. And once hormone treatment begins, the patient needs to continue working with his or her clinicians to arrive at the proper dosage by monitoring side effects and clinical responsiveness, as well as adjusting dosage accordingly. Indeed, the available evidence showed that this process alone can take many months. Throughout and subsequent to this dosing period, a patient's blood pressure, weight, pulse, heart and lungs must also be monitored for any signs of cardiovascular impairment and venous thromboembolism. Finally, the evidence supports the need for ongoing psychological monitoring and treatment during this same period.

Accordingly, Osborne's recommended course of treatment would have required testing, adjustment *and* ongoing monitoring, none of which DOC could insure in light of Mitchell's imminent release from its jurisdiction. Therefore, Dr. Kallas and the rest of the Committee had a sound basis in medical science and DOC policy to deny Mitchell's request when ultimately brought before them for decision.

At most, Mitchell's objection to the DOC's denial of her hormone treatments amounts to a disagreement on the proper medical and psychological protocols for an inmate who is suffering from gender dysphoria *and* facing imminent release. Yet Mitchell's arguments do not

17

acknowledge that the DOC's approach takes into account serious complications that can result from commencing and then interrupting (or at least failing to monitor) hormone treatment. *See Fields*, 712 F. Supp. 2d 830, 845 (E.D. Wis. 2010), *aff'd* 653 F.3d 550 (7th Cir. 2011) (complications of hormone treatment may include heart disease, hypertension and diabetes). Mitchell's disagreement with the DOC's cautious approach to commencing hormone treatment does not establish that the denial was "blatantly inappropriate." *See Pyles*, 771 F.3d at 409.

## II. Qualified Immunity

Finally, defendants assert that qualified immunity shields them from liability for monetary damages because their actions did not violate "clearly established constitutional or statutory rights." *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks omitted) (alteration in original). Courts are required to define the clearly established right at issue on the basis of the specific context of the case. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014). However, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.* They must likewise be sure to draw all inferences in favor of the non-movant. *Id.*

Here, plaintiff is seeking monetary damages for the defendants' delay in approving her request for hormone treatment. Yet she cannot cite -- and the court has not located -- any cases suggesting that she had a clearly established right to hormone treatment when requested.

Rather, the methodical approach adopted by those responding to Mitchell's request for hormone treatment actually appears to be consistent with the most recent authority on this issue. In *Kosilek v. Spencer*, 774 F.3d 63, 91-92 (1st Cir. 2014), the Court of Appeals in the First Circuit found that a doctor for the Department of Corrections had not acted with deliberate indifference in deferring to recommendations from outside gender dysphoria experts. In *Kosilek*, the inmate sought sex reassignment surgery, and the First Circuit held that the decision not to provide the surgery did not violate the Eighth Amendment. In doing so, the court acknowledged that the decision may not have been ideal, but because it considered opinions from different experts in that field, including a peer review of the plaintiff's assessment by the same expert, Cynthia Osborne, on whom defendants' relied here, it did not amount to deliberate indifference. *Id.* at 92. Given the current state of law, therefore, defendants are entitled to qualified immunity.

ORDER

IT IS ORDERED that:

(1)  Plaintiff Roy Mitchell's Motion for Reconsideration (dkt. #157) and Motion for Partial Summary Judgment (dkt. #86) are DENIED;

(2)  Defendants' Motion for Summary Judgment (dkt. #110) is GRANTED; and

(3)  The clerk's office is DIRECTED to enter judgment in favor of defendants.

Entered this 25th day of August, 2016.

BY THE COURT:
/s/
WILLIAM M. CONLEY
District Judge